**UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| IN RE AMERICAN DENTAL PARTNERS, INC. SECURITIES LITIGATION | No. 08-cv-10119-RGS (Consolidated Action) |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR FINAL
APPROVAL OF CLASS ACTION SETTLEMENT, CERTIFICATION OF A
SETTLEMENT CLASS, APPROVAL OF PLAN OF ALLOCATION, AND
AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES**

GRANT & EISENHOFER P.A.
Stuart M. Grant (BBO # 549471)
Megan D. McIntyre (*pro hac vice*)
Hung G. Ta (*pro hac vice*)
1201 North Market Street, Suite 2100
Wilmington, DE 19801

*Counsel for Lead Plaintiff Operating Engineers
Construction Industry and Miscellaneous Pension
Fund and Class Counsel for the Class*

## TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................................ 1

FACTUAL BACKGROUND ............................................................................................... 2

I.     SUMMARY OF LEAD PLAINTIFF'S CLAIMS .................................................. 2

II.    THE STATUS OF THE LITIGATION .................................................................. 3

III.   THE MEDIATION AND THE PROPOSED SETTLEMENT ............................... 4

IV.    THE PROPOSED PLAN OF ALLOCATION ....................................................... 4

V.     THE PRELIMINARY APPROVAL ORDER AND THE DISSEMINATION OF
       NOTICE TO THE CLASS ...................................................................................... 5

ARGUMENT ....................................................................................................................... 6

I.     THE COURT SHOULD GRANT FINAL APPROVAL OF THE SETTLEMENT ........... 6

       A.     The Settlement Is Favorable When Compared With The Risks And Likely
              Result Of Continued Litigation ................................................................... 6

       B.     The Settlement Is Favorable When Taking Into Account The Complexity,
              Expense, And Likely Duration Of The Litigation ....................................... 9

       C.     The Stage Of The Proceedings At Which The Settlement Was Reached ............ 10

       D.     The Settlement Was Reached After Arm's-Length Negotiations ....................... 11

       E.     The Class Has Responded Favorably To The Settlement .................................... 12

II.    THE COURT SHOULD CERTIFY THE SETTLEMENT CLASS ................................ 12

       A.     The Prerequisites Of Rule 23(a) Are Satisfied .................................................. 13

       B.     The Prerequisites Of Rule 23(b)(3) Are Satisfied .............................................. 15

       C.     The Notice To The Class Satisfies Both The Preliminary Approval Order
              And Applicable Law .................................................................................... 16

III.   THE COURT SHOULD APPROVE THE PLAN OF ALLOCATION ......................... 17

IV.    THE COURT SHOULD GRANT CLASS COUNSEL'S APPLICATION FOR
       ATTORNEYS' FEES AND EXPENSES ............................................................... 18

CONCLUSION .................................................................................................................... 20

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Amchem Prods. v. Windsor,*
   521 U.S. 591 (1997) ........................................................................................ 15

*In re AOL Time Warner,*
   No. MDL 1500, 2006 WL 903236 (S.D.N.Y. April 6, 2006) ................................ 7, 9, 17, 18

*In re Blech Sec. Litig.,*
   187 F.R.D. 97 (S.D.N.Y. 1999) ........................................................................ 16

*Boeing Co. v. Van Gemert,*
   444 U.S. 472 (1980) ........................................................................................ 18

*Bussie v. Allmerica Fin. Corp.,*
   50 F. Supp. 2d 59  (D. Mass. 1999) .................................................................. 7, 12

*In re Cabletron Sys., Inc. Sec. Litig.,*
   239 F.R.D. 30 (D.N.H. 2006) ........................................................................... 9, 19

*City Partnership Co. v. Atlantic Acquisition Ltd. Partnership,*
   100 F.3d 1041, 1043 (1st Cir. 2006) ................................................................ 6, 12

*In re Community Bank of Northern Va.,*
   418 F.3d 277 (3d Cir. 2005) ............................................................................. 12

*In re Compact Disc Minimum Advertised Price Antitrust Litig.,*
   370 F. Supp. 2d 320 (D. Me 2005) ................................................................... 19

*In re Compact Disc Minimum Advertised Price Antitrust Litig.,*
   216 F.R.D. 197 (D. Me. 2003) ......................................................................... 6, 16

*Conley v. Sears, Roebuck & Co.,*
   222 B.R. 181 (D. Mass. 1998) ......................................................................... 19

*D'Amato v. Deutsche Bank,*
   236 F.3d 78 (2d Cir. 2001) .............................................................................. 12

*Eisen v. Carlisle & Jacquelin,*
   417 U.S. 156 (1974) ........................................................................................ 16

*In re Fidelity/Micron Sec. Litig.,*
   167 F.3d 735 (1st Cir. 1999) ........................................................................... 20

*In re Fleet/Norstar Sec. Litig.,*
   935 F. Supp. 99 (D.R.I. 1996) ......................................................................... 11

*Kirby v. Cullinet Software, Inc.,*
   116 F.R.D. 303 (D. Mass. 1987) ...................................................................... 14

*In re Livent, Inc. Noteholders Sec. Litig.*,
  210 F.R.D. 512 (S.D.N.Y. 2002) ....................................................................................... 15

*In re Lucent Techs., Inc. Sec. Litig.*,
  307 F. Supp. 2d 633 (D.N.J. 2004) ............................................................................... 12, 18

*In re Lupron® Mktg Sales Practices Litig.*,
  228 F.R.D. 75 (D. Mass 2005) ........................................................................................... 6

*Mann & Co., PC v. C-Tech. Indus., Inc.*,
  No. 08–11312, 2010 WL 457572 (D. Mass. Feb. 5, 2010) ............................................. 19

*New England Carpenters Health Benefits Fund v. First DataBank, Inc.*,
  602 F. Supp. 2d 277 (D. Mass. 2009) ................................................................................ 8

*In re Nortel Networks Corp. Sec. Litig.*,
  No. 01-1855, 2006 U.S. Dist. LEXIS 93390 (S.D.N.Y. Dec. 26, 2006) ........................... 12

*In re Oxford Health Plans, Inc.*,
  191 F.R.D. 369 (S.D.N.Y. 2000) ...................................................................................... 14

*In re Relafen Antitrust Litig.*,
  231 F.R.D. 52 (D. Mass. 2005) ................................................................................ 6, 9, 12

*In re StockerYale, Inc. Sec. Litig.*,
  No. 05-177, 2007 WL 4589772 (D.N.H. Dec. 18, 2007) ....................................... 7, 8, 9, 11

*Swack v. Credit Suisse First Boston*,
  230 F.R.D. 250 (D. Mass. 2005) ............................................................................. 9, 14, 15

*In re Transkaryotic Therapies, Inc.*,
  No. 03-10165, 2005 WL 3178162 (D. Mass. Nov. 28, 2005) ........................................... 14

*U.S. v. 8.0 Acres of Land*,
  197 F.3d 24 (1st Cir. 1999) .............................................................................................. 18

*U.S. v. One Star Class Sloop Sailboat*,
  546 F.3d 26 (1st Cir. 2008) .............................................................................................. 19

*Weinberger v. Great Northern Nekoosa Corp.*,
  925 F.2d 518 (1st Cir. 1991) ............................................................................................ 19

*In re WorldCom, Inc. Sec. Litig.*,
  388 F. Supp. 2d 319 (S.D.N.Y. 2005) .............................................................................. 17

## STATUTES & OTHER AUTHORITIES

15 U.S.C. § 78u-4(a)(7) ......................................................................................................... 17

Fed. R. Civ. P. 23(a) ............................................................................................................. 13

Fed. R. Civ. P. 23(b)(3) .......................................................................................................... 15

Fed. R. Civ. P. 23(c)(2)(B) ............................................................................................................. 16

Fed. R. Civ. P. 23(e)(1).................................................................................................................. 16

**INTRODUCTION**

Lead Plaintiff, the Operating Engineers Construction Industry and Miscellaneous Pension Fund ("Plaintiff"), on behalf of the Class (as defined herein) and through Class Counsel, Grant & Eisenhofer P.A., respectfully submits this application for final approval of the proposed settlement (the "Settlement") of this federal securities class action (the "Action") against defendants American Dental Partners, Inc. ("ADPI"), Gregory A. Serrao ("Serrao"), Breht T. Feigh ("Feigh") and Mark W. Vargo ("Vargo") (collectively, the "Defendants").

After more than a year of litigation, the parties reached agreement on the terms of the Settlement as embodied in the Class Action Settlement Agreement dated December 15, 2009 (the "Settlement Agreement").[1]   Under the Settlement, Defendants will cause their directors' and officers' liability insurance carrier to pay $6,000,000 (six million dollars) in cash to the Class, in return for the dismissal of the Action in its entirety and the release of all Released Claims, as defined in the Settlement Agreement.

The Settlement is the product of good faith, arm's-length negotiations among experienced securities counsel, in conjunction with a mediation conducted by the Honorable Nicholas Politan in September 2009.   At the time of the Settlement, the parties and their counsel understood the relative strengths and weaknesses of their claims and defenses, having fully briefed and argued a motion to dismiss, having embarked on discovery, and (in Lead Plaintiff's case) having had its counsel conduct an extensive pre-complaint investigation.   Considering all of the risks and costs of continued litigation, the Settlement is a fair and reasonable result for the Class and should be approved.

Apart from final approval of the Settlement, Class Counsel also seeks an award of attorneys' fees and expenses to be paid from the Settlement Fund.   Class Counsel's fee request of $1,350,000 (22.5% of the Settlement Fund) is within the range of fee awards approved in similar cases, and is slightly less than what Class Counsel would have charged if they had taken this case on an hourly basis at their standard rates.   Class Counsel's expenses of $108,458.28 are likewise reasonable and should be fully reimbursed.

---

[1]   The Settlement Agreement was filed with the Court on December 15, 2009.  All capitalized terms that are not defined herein have the same meanings as set forth in the Settlement Agreement.

**FACTUAL BACKGROUND**

I.      **SUMMARY OF LEAD PLAINTIFF'S CLAIMS**

On September 29, 2008, Lead Plaintiff filed a Consolidated Class Action Complaint (the "Complaint") asserting claims on behalf of a class (the "Class") consisting of all persons who purchased or acquired stock of ADPI during the period from February 25, 2004 to December 13, 2007 (the "Class Period").  Lead Plaintiff asserted a claim under Sections 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") against ADPI and three of its senior executives:  Serrao, Feigh and Vargo.  In addition, Lead Plaintiff asserted a claim under Section 20(a) of the Exchange Act against Defendants Serrao, Feigh and Vargo.

ADPI is a management service organization, providing dental practices with management expertise and capital support.  ¶¶ 24-5.[2]  In 1996, PDHC, Ltd. ("PDHC"), a wholly-owned subsidiary of ADPI, entered into an affiliation agreement (the "Service Agreement") with PDG, P.A. ("PDG"), a professional association of dentists who practiced in Minnesota under the name "Park Dental."  ¶¶ 28, 30-1.  This Service Agreement with PDG was ADPI's first affiliation transaction and its most important, accounting for more than 50% of ADPI's revenues during the first few years of ADPI's existence.  ¶ 32.

Lead Plaintiff alleged that, commencing in 2002, ADPI and PDHC engaged in conduct that violated the Service Agreement.  ¶¶ 49-53, 55-8.  Lead Plaintiff alleged that ADPI was able to divert to itself significant sums of money that should have been paid to PDG under the Service Agreement, as well as implement various impermissible cost-cutting measures in violation of the Service Agreement.  ¶¶ 49-53, 55-66.  Through these actions, ADPI painted a picture of profitability for investors that was false.  ¶¶ 58, 66.

On February 6, 2006, ADPI disclosed that PDG had commenced a lawsuit (initially against PDHC, and later also against ADPI) in Minnesota state court (the "PDG Lawsuit"), arising from the violations described above.  ¶ 68.  Upon this announcement, ADPI's stock price fell from $16.41 per

---

[2]     Citations to "¶ __" refer to the Complaint.

share on February 3 to $11.49 per share at the close of trading on February 7, 2006.  ¶ 69.  In response to the commencement of the PDG Lawsuit, Defendants are alleged to have issued further statements which they knew were false and misleading, including claims that PDG's claims were "without merit" and "baseless." ¶¶ 71-3.

While the PDG Lawsuit was pending, ADPI decided to sever its relationship with PDG.  ¶ 74.  As alleged in the Complaint, Defendants proceeded to further mislead ADPI's investors by assuring the public markets that ADPI would honor the Service Agreement.  *Id.*  When ADPI later disclosed that it no longer intended to perform under the Service Agreement, it continued to mislead the public by telling investors that ADPI had a plan to continue to operate the Park Dental clinics without PDG.  *Id.*  The Complaint alleged that Defendants in fact knew ADPI's plan involved improper conduct that subjected ADPI to even greater legal liability.  ¶¶ 74-90.

On December 12 and 13, 2007, following a month-long trial of the PDG Lawsuit, the jury found that ADPI had violated its obligations to PDG. ¶¶ 135-137.  The jury awarded PDG compensatory damages of more than $88 million and punitive damages of $42.25 million, finding that ADPI had acted "with deliberate disregard for the rights of PDG." ¶ 137.  Upon the announcement of the jury's verdicts, ADPI's share price plummeted from $19.70 on December 11, 2007, to close at just $4.62 on December 13, 2007.  ¶¶ 136-7.

## II.  THE STATUS OF THE LITIGATION

After being appointed to lead this action, Lead Plaintiff and Class Counsel conducted an extensive investigation that included review of testimony and evidence from the PDG Lawsuit.  Those efforts culminated in the filing of the Complaint on September 29, 2008.

Defendants moved to dismiss the Complaint under Rules 9(b) and 12(b) of the Federal Rules of Civil Procedure on a number of grounds, including that Plaintiffs had not alleged any false or misleading statements of material fact; that Plaintiffs had not adequately alleged Defendants' scienter; and that Plaintiffs had not alleged loss causation.  After full briefing and oral argument on April 2, 2009, the Court

denied Defendants' motion to dismiss in its entirety.  The parties thereafter commenced exchanging

discovery and serving subpoenas seeking relevant documents from third parties.

## III.     THE MEDIATION AND THE PROPOSED SETTLEMENT

During the course of discovery, the parties began to discuss the prospects of settlement.  Toward

that end, the parties participated in a mediation session with the Honorable Nicholas Politan, a retired

federal judge, on September 22, 2009.  While that session itself did not result in a settlement, the parties

continued to talk afterwards and, with Judge Politan's assistance, ultimately agreed upon the Settlement

less than a month later.

Under the Settlement, Defendants will cause their directors' and officers' liability insurance

carrier to pay $6,000,000 in cash to the Class, in return for a dismissal of the Action and releases of the

Released Claims, as defined in the Settlement Agreement.[3]  The $6,000,000 will be paid pursuant to a

$10,000,000 directors' and officers' liability insurance policy.  Defendants and their insurers informed

Lead Plaintiff that this was the only such policy the Company carried; that a portion of the $10,000,000

had already been expended in connection with Defendants' defense of this Action and a separate

shareholder derivative action; and that continued litigation would further deplete the insurance proceeds

that would otherwise be available for settlement or payment of a judgment.

## IV.     THE PROPOSED PLAN OF ALLOCATION

The proposed Plan of Allocation of Settlement Proceeds (the "Plan of Allocation") is attached as

Exhibit E to the accompanying Declaration of Megan D. McIntyre in Support of Motion for Final

Approval of Class Action Settlement, Certification of a Settlement Class and Award of Attorneys' Fees

and Reimbursement of Expenses ("McIntyre Decl.").  It provides that the $6,000,000 settlement amount,

---

[3]      "Released Claims" are defined as claims that have been, could have been, or in the future might be asserted by Lead Plaintiff or any other member of the Class, whether in an individual, class, direct, derivative, representative, legal, equitable, or any other type of capacity, against Defendants, Defendants' Insurer and their respective affiliates, agents, employees, attorneys, representatives, advisors, heirs, executors, estates, administrators, successors-in-interest, assigns, insurers, accountants, or investment advisors, in connection with the purchase, sale or acquisition of ADPI common stock during the Class Period, and that arise out of, or that relate in any way to the acts, facts, or events alleged in the Action or any claim that was or could have been brought in the Action.  *See* Settlement Agreement ¶ 1.19.

less all taxes and all approved costs, fees and expenses, shall be distributed to Class members who submit timely and valid proofs of claim.  Class Counsel developed the Plan of Allocation with the assistance of a damages expert, and it reflects Lead Plaintiff's allegations that the revelations of Defendants' alleged misrepresentations and omissions corrected and removed the artificial inflation of ADPI's stock that had been caused by those misrepresentations and omissions.  *See* McIntyre Decl. ¶ 10 & Ex. E.

While the Class members' per-share recoveries cannot be finally determined until after the Proof of Claim deadline has passed and all claims have been processed, Class Counsel have estimated, with the assistance of their damages expert, that the average recovery per damaged share of ADPI stock will be $0.57 before deduction of fees and expenses.  *See* McIntyre Decl. ¶ 10.

## V.     THE PRELIMINARY APPROVAL ORDER AND THE DISSEMINATION OF NOTICE TO THE CLASS

The Court entered a Preliminary Approval Order on December 22, 2009, and in accordance with the terms of that order, the Claims Administrator undertook reasonable measures to identify the members of the Settlement Class and their addresses, including by obtaining a list of Class Period purchasers from ADPI's transfer agent, by obtaining a list of registered holders of ADPI stock from the Depository Trust Company, and by contacting over four hundred brokerage firms and other nominees to request the identities of their account holders who may have purchased ADPI stock during the Class Period.  *See* Declaration of Steven Platt Regarding Dissemination of Notice to the Class ("Platt Decl.") at ¶¶ 4-8, submitted herewith.  The Claims Administrator mailed approximately 14,000 copies of the Court-approved Class Notice to each identified Class member.  *Id.* at ¶¶ 7, 9.  The Claims Administrator published the Court-approved Summary Publication Notice (the "Summary Notice") on January 15, 2010, as prescribed by the Preliminary Approval Order.  *Id.* at ¶¶ 10, 11.  Finally, the Claims Administrator established a website and a toll-free telephone number dedicated to assisting Class members.  *Id.* at ¶ 13. No objections have been received from any member of the Class, and only three Class members (three affiliated funds) have requested exclusion.  *Id.* at ¶ 12; McIntyre Decl. ¶ 11.

## ARGUMENT

### I.   THE COURT SHOULD GRANT FINAL APPROVAL OF THE SETTLEMENT

Federal Rule of Civil Procedure 23(e) requires that a class action settlement be "fair, reasonable and adequate" in order to merit final approval.  "There is no single test in the First Circuit for determining the fairness, reasonableness, and adequacy of a proposed class action settlement." *In re Relafen Antitrust Litig.,* 231 F.R.D. 52, 72 (D. Mass. 2005) (quoting *In re Compact Disc Minimum Advertised Price Antitrust Litig.,* 216 F.R.D. 197, 206 (D. Me. 2003)).  Accordingly, courts within the First Circuit look to factors considered by other Circuits, including: "(1) comparison of the proposed settlement with the likely result of litigation; (2) reaction of the class to the settlement; (3) stage of the litigation and the amount of discovery completed; (4) quality of counsel; (5) conduct of the negotiations; and (6) prospects of the case, including risk, complexity, expense and duration." *Id.*  Generally, "[w]hen sufficient discovery has been provided and the parties have bargained at arms-length, there is a presumption in favor of the settlement." *City Partnership Co. v. Atlantic Acquisition Ltd. Partnership*, 100 F.3d 1041, 1043 (1st Cir. 2006).  When assessed in light of these criteria, the Settlement should be approved.

### A.   The Settlement Is Favorable When Compared With The Risks And Likely Result Of Continued Litigation

In assessing the fairness, reasonableness and adequacy of a settlement, the Court must balance the immediacy and certainty of recovery for the Class against not only the result that could be achieved through continued litigation, but also the risks associated with such litigation.  *See, e.g., In re Compact Disc Minimum Advertised Price Antitrust Litg.*, 216 F.R.D. 197, 207 (D. Me. 2003) (approving settlement after comparing "the value of the settlement . . .  [with] the relief plaintiffs might recover after a successful trial and appeal, discounted for risk, delay and expense").  However, "a fine-tuned equation by which to determine the reasonableness of the size of a settlement fund does not exist." *Relafen*, 231 F.R.D. at 73.  The fact that the Class could have theoretically received more if the action had been successfully litigated through trial is not a reason to deny approval of the Settlement. *See In re Lupron® Mktg Sales Practices Litig.*, 228 F.R.D. 75, 97-98 (D. Mass 2005) ("[w]hile it is possible to hypothesize

about larger amounts that might have been recovered,…[…]…'[t]he evaluating court must . . . guard against demanding too large a settlement based on its view of the merits of the litigation; after all, settlement is a compromise, a yielding of the highest hopes in exchange for certainty and resolution'") (internal citations omitted).  Rather, the Court need only determine whether the Settlement falls within a "range of reasonableness."   *In re AOL Time Warner*, No. MDL 1500, 2006 WL 903236, at *8 (S.D.N.Y. Apr. 6, 2006).

Lead Plaintiff believes its claims against Defendants are meritorious, and its damages expert has estimated the Class-wide damages to be between $86 million and $90 million.  While Defendants have not provided an alternative estimate of damages, it can fairly be assumed that Defendants would vigorously contest Lead Plaintiff's figures and would proffer a substantially lower figure.  Lead Plaintiff acknowledges, moreover, that even assuming Lead Plaintiff's damage figure is the correct one, there are a number of substantial risks and obstacles to the recovery of those damages.

First, Defendants have steadfastly denied any wrongdoing, and have asserted a number of significant defenses that, if successful, could result in zero liability.  For example, Defendants contend that their alleged misstatements were not false or misleading, and that they had no legal obligation to disclose the information that they are alleged to have failed to disclose.  In addition, Defendants have taken the position that the Class cannot establish that their losses were caused by the alleged fraud, and also that the Class cannot invoke the "fraud-on-the-market" rule to establish the reliance element of their claims.  As a result, Lead Plaintiff faced the risk that it might ultimately fail to establish Defendants' liability to the Class – a risk that is eliminated by the Settlement.  *See In re StockerYale, Inc. Sec. Litig.*, No. 05-177, 2007 WL 4589772, at *3 (D.N.H. Dec. 18, 2007) (where an all-cash settlement was achieved in the face of "various defenses [that] could result in no liability or zero recovery for the class," a comparison of the risks and rewards of further litigation with the benefits of the settlement weighed in favor of settlement); *Bussie v. Allmerica Fin. Corp.*, 50 F. Supp. 2d 59, 76 (D. Mass. 1999) ("[T]he reality that the Class would encounter significant, and potentially insurmountable obstacles to a litigated recovery underscores the reasonableness of the compromise set forth in the Settlement Agreement").

7

Second, even if Lead Plaintiff were to prevail at trial on both liability and damages, there is a very real risk that the Class would be unable to collect on a judgment following trial. Of the $10,000,000 in insurance coverage that was originally available, a portion has already been expended on defense costs. If the litigation were to continue – which could take years through trial and any appeals – defense costs would continue to erode the remaining coverage, and the $6,000,000 that is being paid in the Settlement would likely disappear. The only other source of funds to pay a judgment would be the assets of ADPI and its three executives who are named as defendants. Lead Plaintiff does not believe the individual Defendants have sufficient personal wealth to pay a multi-million dollar judgment,[4] and ADPI itself is in precarious financial condition. At the time of the mediation, the Company's total market capitalization was only about $220 million, and today it is even less: approximately $205 million. *See* McIntyre Decl., Ex. C. ADPI's stock price has never recovered from the impact of the disclosures at the end of the Class Period, and – having traded consistently above $20 per share for virtually all of 2007 prior to those disclosures – has never again closed above $15.02 per share. *Id.* This is not a company that can be expected to bear a substantial judgment, and this fact favors settlement. *See New England Carpenters Health Benefits Fund v. First DataBank, Inc.*, 602 F. Supp. 2d 277, 281 (D. Mass. 2009) (approving settlement even though facts strongly supported liability, where corporate defendant had "limited finances and questionable insurance coverage," noting: "you can't get blood from a stone"); *In re StockerYale, Inc. Sec. Litig.*, 2007 WL 4589772, at *4 (approving $3.4 million securities class action settlement and stating: "The Court finds significant that StockerYale is essentially still a development stage Company and has limited resources. Indeed, the Company's stock price remains a fraction of what it was during the Class Period.")

---

[4]     According to ADPI's most recent proxy statement, the total compensation paid by ADPI to these defendants in 2008 was $748,806 to Serrao, $438,361 to Feigh, and $209,031 to Vargo. For the three year period encompassing 2006 through 2008, Serrao received a total of $2,932,413 in compensation from ADPI (much of it in the form of stock options), while Feigh received $1,812,785 and Vargo received $669,966. *See* McIntyre Decl., Ex. D. Even if all three defendants' total compensation for *three entire years* could be recovered for the Class (which is unrealistic to expect), it would yield only about $5.4 million – less than the Settlement amount.

When the potential benefits of a favorable result at trial are discounted based on the risks associated with continued litigation, the proposed Settlement is within the range of reasonableness. As the Court noted in granting final approval in *In re Relafen*, 231 F.R.D. at 74, "'[a]lthough fully litigating the claims through trial could possibly result in a higher recovery, the settlement represents a necessary compromise between inherent risks of doing so and a guaranteed cash recovery.'" (citation omitted). Moreover, the $6,000,000 Settlement (estimated to be approximately $0.57 per damaged share) is within the range of settlement values that have been approved in other securities class actions in this Circuit. *See, e.g., Swack v. Credit Suisse First Boston, LLC*, No. 02-CV-11943, 2006 WL 2987053, *1 (D. Mass. Oct. 4, 2006) (approving $3 million settlement, estimated at $0.085 per share); *In re Cabletron Sys., Inc. Sec. Litig.*, 239 F.R.D. 30, 35 (D.N.H. 2006) (approving $10.5 million settlement).

**B.      The Settlement Is Favorable When Taking Into Account The Complexity, Expense, And Likely Duration Of The Litigation**

This is a complex securities fraud action, requiring potentially voluminous discovery including numerous depositions prior to trial, as well as costly expert discovery regarding issues such as loss causation, damages, and the availability of a presumption of reliance. Significant time would also have to be spent on class certification briefing, summary judgment, and pre-trial motions, and the trial itself would be lengthy and complex. Having had experience taking federal securities class actions to trial, Class Counsel is well aware of the difficulties inherent in presenting complex securities litigation concepts to juries in a clear and understandable way, including issues such as market efficiency, loss causation and damages, which typically require expert testimony based on sophisticated economic models. While Lead Plaintiff and Class Counsel are confident in their abilities to present this information in a coherent and understandable format, the subject matter of the action and the nature of the claims are nevertheless inherently susceptible to confusion by lay jurors. Thus, the complexity of this litigation favors approval of the Settlement. *See In re StockerYale, Inc. Sec. Litig.*, 2007 WL 4589772, at *3 ("this factor supports settlement because continuing discovery before trial, class certification and continuing litigation would have required additional document production, various depositions, extensive pretrial

motions addressing complex factual and legal questions, and ultimately a complicated, lengthy trial”); *AOL Time Warner*, 2006 WL 903236, at *8 (“Due to its notorious complexity, securities class action litigation is often resolved by settlement, which circumvents the difficulty and uncertainty inherent in long, costly trials.”).

Furthermore, Lead Plaintiff faced no assurances that this Action would be resolved any time soon or, if it were to be reduced to a judgment, that either party would not take appeal.  The passage of time would increase the likelihood of the available insurance proceeds being fully depleted, as well as the risk of the Defendants becoming insolvent.  Further, delays in achieving a recovery would make it more difficult to identify, locate, and notify Class members to ensure that they have a fair opportunity to submit their claims to share in the proceeds.  The Settlement minimizes these risks by providing an immediate cash payment to the Class.

### C.       The Stage Of The Proceedings At Which The Settlement Was Reached

Before the Settlement was negotiated, Lead Plaintiff had been prosecuting this action for over a year.  Before the Complaint was even filed, Class Counsel had already reviewed the SEC filings made by ADPI over a period of several years and numerous analyst reports and news articles published concerning ADPI during that period.  McIntyre Decl. ¶ 2.  Class Counsel had also reviewed the pleadings, motion papers, and supporting affidavits filed in the PDG Lawsuit, as well as the voluminous trial record from the PDG Lawsuit (consisting of transcripts from 15 days of trial testimony and other trial proceedings).  Once discovery commenced in this Action, the parties exchanged initial disclosures and Lead Plaintiff served Defendants with an initial set of thirty-five separate requests for the production of documents, in response to which Defendants produced nearly 160,000 pages of documents.  *Id*.  Lead Plaintiff also served document subpoenas on various third parties.  For their part, Defendants served Lead Plaintiff with an initial set of thirty-three separate document requests and propounded twenty-two interrogatories, to which Lead Plaintiff responded by producing approximately 4,400 pages of documents and providing detailed interrogatory responses.  Defendants also served document subpoenas on at least three third parties.  Although depositions had not yet commenced, Lead Plaintiff had the benefit of having reviewed

trial testimony from the PDG Lawsuit that bore directly on the alleged fraud – *i.e.*, ADPI's misconduct toward PDG (which was not disclosed to investors and/or formed the basis of other misrepresentations), and Defendants' knowledge of that misconduct.   *Id.*   As a result, the parties were well-informed of the factual evidence both in support of and against their respective positions.

Furthermore, prior to the mediation, the parties had briefed and argued Defendants' motion to dismiss, and thus were familiar with the law surrounding Defendants' anticipated defenses to this action, including issues regarding the standards to be applied when evaluating the falsity of certain types of statements, and the extent to which Defendants had an obligation to disclose information to investors. The briefing on Defendants' motion to dismiss and the preparation of mediation submissions also gave the parties an opportunity to flesh out their factual and legal positions regarding other key elements of the case, including scienter, reliance, and loss causation.

In sum, the Settlement was achieved at a time when the parties and their counsel were sufficiently knowledgeable about the strengths and weaknesses of their claims and defenses that they were able to make well-informed decisions regarding the Settlement.   Thus, the stage of the proceedings supports approval of the Settlement.   *See In re StockerYale, Inc. Sec. Litig.*, 2007 WL 4589772, at *3 (approving settlement where "Class counsel had the benefit of information obtained through document discovery and its extensive own investigation"); *In re Fleet/Norstar Sec. Litig.*, 935 F. Supp. 99, 106 (D.R.I. 1996) (approving class action settlement where "[t]he timing of the agreement indicate[d] that counsel for both sides were sufficiently apprised of all proffered theories and defenses").

### D.      The Settlement Was Reached After Arm's-Length Negotiations

This Settlement was reached following a mediation before a respected former judge, the Honorable Nicholas Politan, who has significant experience mediating complex class actions.   After vigorous negotiations, the mediation concluded with no settlement being reached.   Subsequently, the parties continued their discussions with the assistance of Judge Politan, and ultimately agreed upon the Settlement.   Where, as here, a settlement is reached after vigorous arm's-length negotiations among experienced counsel with the participation of an experienced mediator, there is a presumption that the

11

settlement is fair and reasonable.  *See City P'ship Co.*, 100 F.3d at 1043; *Bussie*, 50 F. Supp. 2d at 77.

*See also D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001) (noting that a "mediator's

involvement in . . . settlement negotiations helps to ensure that the proceedings were free of collusion and

undue pressure").

      **E.**    **The Class Has Responded Favorably To The Settlement**

      "Courts [have] construe[d] class members failure to object to proposed settlement terms as

evidence that the settlement is fair and reasonable." *In re Lucent Techs., Inc. Sec. Litig.,* 307 F. Supp. 2d

633, 643 (D.N.J. 2004).  *See also Bussie*, 50 F. Supp. 2d at 77-78 (favorable reaction of class to

settlement, albeit not dispositive, constitutes strong evidence of fairness of proposed settlement and

supports judicial approval).  As noted above, notice of the Settlement was published in *Investors Business*

*Daily* and a total of approximately 14,000 copies of the Class Notice were mailed to potential Class

Members.  While three Class members (all controlled by a single entity) have elected to opt out of the

Class, not a single Class member who will be bound by the Settlement has objected to its terms.  *See* Platt

Decl. ¶ 12; McIntyre Decl. ¶ 11.  This small number of opt-outs and absence of any objections weighs in

favor of approval.  *See, e.g., In re Nortel Networks Corp. Sec. Litig.*, No. 01-1855, 2006 WL 3802198 at

*5 (S.D.N.Y. Dec. 26, 2006) (approval despite 35 objections received representing approximately

0.0025% of the class); *Bussie*, 50 F. Supp. 2d at 77 (approval despite 13 objections representing .003% of

the class); *Relafen*, 231 F.R.D. at 72 (approval despite 10 objections and 140 requests for exclusions).

**II.**    **THE COURT SHOULD CERTIFY THE SETTLEMENT CLASS**

      Courts have long acknowledged the propriety of class certification for purposes of settlement.

*See In re Community Bank of Northern Va.*, 418 F.3d 277, 299 (3d Cir. 2005) ("'all Federal Circuits

recognize the utility of Rule 23(b)(3) settlement classes' as a means to facilitate the settlement of complex

nationwide class actions") (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 618 (1997)).  Like

any other class certification decision, certification of a class for settlement purposes requires a

determination that the requirements of Rule 23 are met.  *Id.*  Specifically, a class action must meet each of

the four requirements set forth in Rule 23(a), and at least one of the three requirements set forth in Rule

23(b).

In the Preliminary Approval Order, the Court preliminarily certified a Class for settlement purposes under Rule 23(b)(3), consisting of:

> all persons and entities who purchased or acquired common stock of ADPI between and including February 25, 2004 and December 13, 2007 (the "Class Period"); provided, however, that the Class excludes: Defendants; each of ADPI's officers, directors, subsidiaries and affiliates during the Class Period; members of the Defendants' immediate families and their legal representatives, heirs, successors and assigns; any entity in which any of the foregoing have or had a controlling interest; and the directors and officers liability insurance carriers (and any affiliates or subsidiaries thereof) of ADPI. Also excluded from the Class are any putative Class members who exclude themselves by filing a request for exclusion in accordance with the requirements set forth in the Class Notice.

Preliminary Approval Order (Dkt. No. 36), at ¶ 2.

In accordance with the Preliminary Approval Order, the Claims Administrator published notice of the Settlement and mailed approximately 14,000 copies of the Class Notice to potential Class Members. Platt Decl. ¶¶ 7-9. Accordingly, it is now appropriate for the Court to formally certify the Class for settlement purposes, including certification of Lead Plaintiff as class representative.

### A.    The Prerequisites Of Rule 23(a) Are Satisfied

Class certification is appropriate under Rule 23(a) if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a). Each of these requirements is met here.

*First*, the Class is sufficiently numerous to warrant certification. ADPI has approximately 15.68 million shares of stock outstanding, which were traded on Nasdaq during the Class Period. While the precise number of persons who purchased stock during the Class Period is not known, based on transaction data provided by ADPI's transfer agent, the Claims Administrator has mailed approximately 14,000 copies of the Class Notice to potential Class members, including copies sent to brokers and nominees to be forwarded to their beneficial holders. The Claims Administrator estimates that there are

at least 13,601 Class Members.  Platt Decl. ¶ 9.  Joinder of thousands of geographically dispersed Class members would be impracticable, to say the least.

*Second*, the claims in this action present numerous common questions of law and fact regarding, *inter alia*, the falsity and materiality of Defendants' statements; whether Defendants acted with scienter; whether reliance may be presumed pursuant to the fraud-on-the-market rule; and the extent to which Defendants' alleged fraud caused the Company's stock price to be inflated.  Rule 23(a)(2) requires "that questions of law or fact be shared by the prospective class, but does not require that every question be common."  *Kirby v. Cullinet Software, Inc.*, 116 F.R.D. 303, 306 (D. Mass. 1987).  Thus, "[t]he threshold of commonality is not a difficult one to meet."  *In re Transkaryotic Therapies, Inc.*, No. 03-10165, 2005 WL 3178162, at *2 (D. Mass. Nov. 28, 2005) (citation omitted).

*Third*, the injuries to Lead Plaintiff and the other members of the Class are attributable to the same alleged course of conduct by the Defendants, and liability for this conduct is predicated on the same legal theories.  "In general, 'a plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory.'"  *In re Transkaryotic Therapies, Inc. Sec. Litig.*, 2005 WL 3178162, at *3 (citation omitted).  "As with the commonality requirement, the typicality requirement does not mandate that the claims of the class representative be identical to those of the absent class members."  *Swack*, 230 F.R.D. at 260.

*Fourth*, for purposes of Rule 23(a)(4), courts measure the adequacy of representation by two standards: (1) whether the plaintiffs' counsel are qualified, experienced, and generally able to conduct the litigation; and (2) whether the class representative has interests antagonistic to those of the class.  *In re Transkaryotic Therapies, Inc. Sec. Litig.*, 2005 WL 3178162, at *4.  *See also In re Oxford Health Plans, Inc.*, 191 F.R.D. 369, 376 (S.D.N.Y. 2000).  Rule 23(a)(4) is satisfied here because Class Counsel has extensive experience in complex securities litigation and class action proceedings, and is qualified and able to conduct this litigation.  Moreover, there is no conflict between the interests of Lead Plaintiff and the Class, because they share the common goal of maximizing recovery.

**B.      The Prerequisites Of Rule 23(b)(3) Are Satisfied**

Rule 23(b)(3) authorizes class certification "if the Court finds that questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).  Rule 23(b)(3) is "designed to secure judgments binding all class members save those who affirmatively elect[] to be excluded," where a class action will "achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Amchem Prods. v. Windsor*, 521 U.S. 591, 614-15 (1997) (citation omitted).  The requirements of Rule 23(b)(3) are easily met in this case.

"Class-wide issues predominate if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *In re Livent, Inc. Noteholders Sec. Litig.*, 210 F.R.D. 512, 517 (S.D.N.Y. 2002).  Here, all the Class members' claims against Defendants are based on the same alleged course of conduct, and there are numerous common issues relating to Defendants' liability which predominate over any individualized issues.  Indeed, the Rule 23(b)(3) test of predominance is "readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws." *Amchem Prods*, 521 U.S. at 625.

With respect to the superiority of a class action as the means of adjudicating this dispute, Rule 23(b)(3) sets forth the following non-exhaustive factors to be considered: "(A) the class members' interests in individually controlling the prosecution ... of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by ... class members; (C) the desirability ... of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action."  When applying these factors, courts in this and other Circuits have concluded that the class action device in securities cases is usually the superior method by which to redress injuries to a large number of investors. *See, e.g., Swack*, 230 F.R.D. at 273 ("the piecemeal adjudication of

numerous separate lawsuits covering the same or substantially similar issues--*i.e.,* the Defendants'
allegedly illegal conduct and the impact thereof on the market price of Razorfish stock--would be an
inefficient allocation of limited court resources."); *In re Blech Sec. Litig.,* 187 F.R.D. 97, 106 (S.D.N.Y.
1999) ("In general, securities suits … easily satisfy the superiority requirement of Rule 23.   Most
violations of the federal securities laws … inflict economic injury on large numbers of geographically
dispersed persons such that the cost of pursing individual litigation to seek recovery is not feasible.
Multiple lawsuits would be costly and inefficient").

Here, given the large number of Class members, this consolidated class action is "superior to
other available methods for the fair and efficient adjudication" of the separate claims of these numerous
Class members.   Indeed, Class members have been notified of this class action and of their right to opt out
of the Class and pursue individual litigation, and only a single individual action (filed by three related
funds) has been filed.   The absence of significant individualized litigation is not surprising given the
tremendous costs associated with such litigation.   Accordingly, the requirements of Rule 23(b)(3) are
satisfied, and the Court should certify this Action as a class action on behalf of the proposed Class.

### C.        The Notice To The Class Satisfies Both The Preliminary Approval Order And Applicable Law

When a court certifies a class under Rule 23(b)(3), notice must be served on all class members
who can be identified through reasonable efforts.   Fed. R. Civ. P. 23(c)(2)(B).   For settlements, Rule 23(e)
also instructs courts to "direct notice in a reasonable manner to all class members who would be bound by
the proposal."[5]   Fed. R. Civ. P. 23(e)(1).   Such notice "must describe fairly, accurately and neutrally the
claims and parties in the litigation, the terms of the proposed settlement, and the options available to
individuals entitled to participate, including the right to exclude themselves from the class."   *Compact
Disc*, 216 F.R.D. at 203.

---

[5]        It is not necessary to establish that all Class members actually received notice; rather, to comport with the
Due Process Clause of the Constitution, the notice "must be reasonably calculated to reach potential class
members."  *Compact Disc*, 216 F.R.D. at 203.  *See also Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173-74 (1974).

In addition to the requirements of Rule 23 and Due Process, the PSLRA requires a notice of a proposed securities class action settlement to contain the following information: (1) the amount of the settlement, in the aggregate and on a per-share basis; (2) if the parties disagree on the average amount of damages per share, a statement from each settling party concerning the issue or issues on which the parties disagree; (3) a statement of attorneys' fees or costs sought; (4) the name, address and telephone number of a representative of plaintiffs' counsel who is available to answer questions; and (5) a brief statement explaining why the parties are proposing the settlement. 15 U.S.C. § 78u-4(a)(7).

The notices in this case met all of the above requirements. The Class Notice provided detailed descriptions of the Action, the Settlement, and the options available to potential Class members, including the right to object or opt out of the Class. *See* Platt Decl., Ex. 1. The Publication Notice provided similar information in summary form, and informed the reader how to obtain a copy of the more detailed Class Notice. *See* Platt Decl., Ex. 3. With respect to the PSLRA's requirements, the Class Notice: (1) stated the amount of the proposed Settlement in the aggregate and on an estimated per-share basis; (2) described the parties' areas of disagreement with respect to the Class's recoverable damages; (3) stated the amount of attorneys' fees and expenses to be sought by Class Counsel, and the basis for the request; (4) identified representatives of Class Counsel who can be contacted for additional information; and (5) explained the reasons for the Settlement. *See* Platt Decl., Ex. 1.

## III.     THE COURT SHOULD APPROVE THE PLAN OF ALLOCATION

The parties' proposed Plan of Allocation for allocating the Settlement proceeds among Class members was set forth on pages 8 to 10 of the Class Notice, and is submitted herewith as Exhibit E to the Declaration of Megan D. McIntyre. The standard for approval of a plan of allocation is the same as that for approving a settlement: it must be fair, reasonable and adequate. *AOL Time Warner*, 2006 WL 903236, at *17. To meet this standard, "'an allocation formula need only have a reasonable, rational basis, particularly if recommended by experienced and competent class counsel.'" *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 344 (S.D.N.Y. 2005) (citation omitted). Further, "a plan of allocation

that reimburses class members based on the type and extent of their injuries is generally reasonable." *Lucent Techs., Inc.*, 307 F. Supp. 2d at 649.

The Plan of Allocation was developed by Class Counsel in consultation with a damages expert, and allocates the Settlement proceeds based on the estimated amount by which ADPI's stock price was artificially inflated on various dates as a result of the alleged fraud.  *See* McIntyre Decl. ¶ 10 & Ex. E. The Plan fairly provides for Class members' "Recognized Claims" to be calculated based on the timing of their purchases and sales of ADPI stock, and then provides for each Class member to receive a *pro rata* share of the Net Settlement Fund based on the size of its Recognized Claim as compared to the aggregate amount of all Recognized Claims.  *Id.*  The Plan thus allocates the Settlement proceeds based on the extent of the Class members' relative injuries, and as such it is fair, reasonable, and should be approved. *See AOL Time Warner*, 2006 WL 903236, at *17 (noting that plans of allocation which calculate claims according to inflationary loss have been found to be a reasonable approach to the calculation of damages).

## IV.    THE COURT SHOULD GRANT CLASS COUNSEL'S APPLICATION FOR ATTORNEYS' FEES AND EXPENSES

Class Counsel litigated this Action on behalf of the Class on a contingent fee basis, and advanced all expenses on behalf of the Class.  In accordance with a fee agreement negotiated at the outset of the case between Class Counsel and Lead Plaintiff (an institutional investor), Class Counsel is applying for – and Lead Plaintiff supports – attorneys' fees of $1,350,000 (22.5% of the Settlement Fund) and reimbursement of $108,458.28 in litigation expenses and costs.  Notice of this application has been provided to the Class as part of the Class Notice, and not a single objection has been lodged.

It has long been recognized that an attorney who recovers a common fund for the benefit of a class is entitled to recover reasonable attorneys' fees payable from the fund.  *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478-79 (1980).  The First Circuit recognizes that "[t]he trial court enjoys 'extremely broad' latitude in determining the appropriate shares of the common fund, and may calculate such an award either on the basis of a reasonable percentage of the fund, or using a lodestar method to multiply a reasonable hourly rate by the compensable hours the attorney worked on the matter." *U.S. v. 8.0 Acres of*

*Land*, 197 F.3d 24, 32 (1st Cir. 1999).  The percentage approach is the prevailing method for awarding attorneys' fees in common fund cases in this Circuit and throughout the country.  Among other reasons, it aligns the lawyers' interest with the interest of the Class in maximizing the recovery.  However, the lodestar method is frequently used as a cross-check on the reasonableness of a percentage-based award.  *See In re Cabletron*, 239 F.R.D. at 37-38.  Here, Class Counsel's fee request is fair and reasonable under either method.

Under the "percentage-of-recovery" method, the court has broad discretion in determining a reasonable percentage to award to class counsel.  Where possible, the court may try to estimate what the fee arrangement would have been, had it been negotiated at the outset.  *In re Cabletron*, 239 F.R.D. at 41.  Here, there is no need to estimate, because a percentage of 22.5% *was* negotiated at the outset between Class Counsel and Lead Plaintiff, a sophisticated institutional investor.  *See* McIntyre Decl. ¶ 3.  The reasonableness of this percentage is further confirmed by the fact that it is within the range typically awarded by courts in this and other Circuits.  *See, e.g., U.S. v. 8.0 Acres of Land*, 197 F.3d 24 (1st Cir. 1999) (affirming award of approximately 23%); *In re Cabletron*, 239 F.R.D. at 42 (citing study that found the "median fee in securities class actions is 25 percent," and awarding 21.5%); *Mann & Co., PC v. C-Tech. Indus., Inc.*, No. 08–11312, 2010 WL 457572 (D. Mass. Feb. 5, 2010) (awarding 17.5%); *In re Compact Disc*, 370 F. Supp. 2d 320, 322-23 (D. Me. 2005) (awarding 30%); *Conley v. Sears, Roebuck & Co.*, 222 B.R. 181, 187 (D. Mass. 1998) ("a majority of common fund class action fee awards fall between twenty and thirty percent").

Under the lodestar method, the court "multipl[ies] the number of hours productively spent by a reasonable hourly rate."  *U.S. v. One Star Class Sloop Sailboat*, 546 F.3d 26, 38 (1st Cir. 2008).  "[T]he lodestar calculation, when obtained, will be subject to possible enhancement or diminution by the court if it determines that a multiplier or divider should be applied."  *Weinberger v. Great Northern Nekoosa Corp.*, 925 F.2d 518, 529 (1st Cir. 1991).  This method confirms the reasonableness of Class Counsel's request for a fee of $1,350,000, as the amount sought is approximately equal to (and actually slightly less than) Class Counsel's lodestar.  Through March 7, 2010, Class Counsel have expended a total of 3,053.50

hours on this litigation,[6] and when multiplied by Class Counsel's standard hourly rates, this time equates to a lodestar of $1,367,220.50. *See* McIntyre Decl. ¶ 6.

Class counsel have also advanced $108,458.28 to date in litigation expenses and costs on behalf of the Class, for such items as mediation fees, duplication costs, filing fees, postage, expert fees, travel expenses, and on-line legal research charges. *See* McIntyre Decl. ¶ 7 & Ex. B (providing a breakdown of expenses, by category). Lead Plaintiff and Class Counsel respectfully submit that these expenses were reasonable and necessary, and should be reimbursed from the Settlement fund. *See In re Fidelity/Micron Sec. Litig.*, 167 F.3d 735, 737 (1st Cir. 1999) ("lawyers whose efforts succeed in creating a common fund for the benefit of a class are entitled not only to reasonable fees, but also to recover from the fund … expenses, reasonable in amount, that were necessary to bring the action to a climax").

## <u>CONCLUSION</u>

For the foregoing reasons, Class Counsel respectfully request that the Court (a) approve the proposed Settlement; (b) certify the Class; (c) approve the Plan of Allocation; and (d) approve Class Counsel's application for attorneys' fees and expenses. A proposed Final Order and Judgment has been agreed to by the parties and is being submitted herewith for the Court's convenience.

DATED:  March 9, 2010                                     Respectfully submitted,

                                          */s/ Megan D. McIntyre*
                                          GRANT & EISENHOFER P.A.
                                          Stuart M. Grant (BBO # 549471)
                                          Megan D. McIntyre (*pro hac vice*)
                                          Hung G. Ta (*pro hac vice*)
                                          1201 North Market Street, Suite 2100
                                          Wilmington, DE 19801
                                          *Counsel for Lead Plaintiff Operating Engineers*
                                          *Construction Industry and Miscellaneous Pension*
                                          *Fund and Class Counsel for the Class*

---

[6]       This time was spent on, among other tasks, reviewing and analyzing the trial record from the PDG Lawsuit; performing additional legal and factual research for the Complaint; drafting the Complaint; responding to Defendants' motion to dismiss and Defendants' motion to bifurcate discovery; attending a Scheduling Conference before the Court; preparing and responding to interrogatories and document requests; attending the mediation session; and negotiating and drafting the settlement documents. *See* McIntyre Decl. ¶ 2.

**CERTIFICATE OF SERVICE**

I hereby certify that on March 9, 2010 the Motion For Final Approval Of Class Action Settlement, Certification Of A Settlement Class, Approval Of Plan Of Allocation, And Award Of Attorneys' Fees And Reimbursement Of Expenses; Memorandum of Law in Support of Motion For Final Approval Of Class Action Settlement, Certification Of A Settlement Class, Approval Of Plan Of Allocation, And Award Of Attorneys' Fees And Reimbursement Of Expenses; Declaration of Megan D. McIntyre; Declaration of Steven Platt; and proposed Final Order And Judgment were served upon the following counsel of record via CM/ECF:

Bonnie S. McGuire (BBO #651519)
Michelle L. Visser (BBO #663164)
ROPES & GRAY LLP
One International Place
Boston, MA 02110

/s/ Megan D. McIntyre
Megan D. McIntyre (*pro hac vice*)